

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Fort Worth- Division



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 1 7 2016

CLERK U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Criminal No.   4:92-CR-155-Y |
| | § | |
| JESUS OLIVARES, | § | |
| Defendant. | § | |

---

**DEFENDANT'S MEMORANDUM TO REDUCE OR MODIFY
HIS SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(2) CITING
AMENDMENT 782 TO THE UNITED STATES SENTENCING GUIDELINES**

---

Defendant is currently serving a sentence of **life** without the
possibility of parole.  Defendant was sentenced after the judicial
branch adopted Congress enactment of the Sentencing Reform Act of
1984, in which Congress enacted the federal sentencing guidelines.
**18 U.S.C. § 3553(a)(2)(A) to (D).**  The Sentencing Reform Act ("SRA")
of 1984 provides for development of guidelines which further basic
goals of criminal punishment: **deterrence, incapacitation, just
punishment, and rehabilitation;** see U.S. Sentencing Commission
Guidelines Manual, **Ch. 1, Pt.A, intro. Comment, at 1 (November 1995).**

Before the implementation of the Sentencing Guidelines, district courts exercised broad discretion in determining whether and for how long an offender would be incarcerated. Koon v. United States, 116 S.Ct. 2035, 2043 (1995); Mistretta v. United States, 488 U.S. 361 (1989). In response to this preception, Congress passed the SRA which created the U.S. Sentencing Commission whose mission was to develop guidelines which furthered the basic principles of criminal punishment and impose uniform, fair, and proportional sentences. The Guidelines allows a court to depart from the guideline range if "the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described." 18 U.S.C. § 3553(b).

The Guideline Manual provides further elaboration of the Sentencing Commission's policy towards departures. "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." 1995 U.S.S.G. ch.1, pt.A, intro comment. 4(b). For a court to depart from the guidelines, "certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." Koon [supra]. Said guidelines are promulgated by 18 U.S.C. § 3551 et seq., and 28 U.S.C. § 991 et seq.

2

In the case at hand, Defendant's case is unusual.  That is, many changes has surfaced in the judicial branch since the commencement of the "SRA" which Defendant was sentenced under.  Especially, when considering the Mandatory United States Sentencing Guidelines Manual.  See the case of Booker v. United States, 543 U.S. 220 (2005), rendering the Guidelines advisory rather than mandatory.  Defendant was sentenced prior to Booker, under a mandatory regime which gave the district court very little power to depart from the guidelines.  Consequently, many defendants were faced with harsh draconian sentences that would be served indefinitely.  Defendant is one of those defendants with a sentence of life which means his **tentative release date is based on the premises of his death in the Bureau of Prisons**.  Had Defendant been sentenced after Booker, the Court would have had the discretion to sentence Defendant under an advisory regime rather than a mandatory regime.  Here, it should be duly noted, Defendant has been incarcerated for **24 years** for his involvement in a conspiracy in which **no** death resulted or gang related activities were involved in said conspiracy.

Defendant was charged with **relevant conduct** pursuant to § 1B1.3 of the guidelines.  Said relevant conduct **was not** found by a jury of Defendant's peers, which leads to another dramatic change in the federal system that was previously unavailable prior to Defendant's criminal trial proceedings.  See Apprendi v. New Jersey, 530 U.S. 466 (2000), which the U.S. Supreme Court held, "other than the fact of a prior conviction, any **fact that increase** the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and

3

proved beyond a reasonable doubt." Relevant here,... is the fact
Defendant was found guilty on the bases of a general verdict form
which the jury did not determined the amount Defendant was held
responsible for. Since Apprendi, the federal courts have adopted
what is known as a special jury form. Said special verdict form
allows the jury to make the determination of the amount of drugs
attributed to a defendant. During the duration of the conspiracy,
Defendant was alleged to have distribute one kilogram of cocaine.
See Count 36. Therefore, it's fair to state that reasonable jurors
could or would have determined Defendant was only responsible for
the amount of 1 kilogram of cocaine. In addition, in light of
Apprendi, a defendant due process rights to fair notice can be
violated under the scheme in effect at the time of Defendant's
sentence, in the event of said scheme occurring today under a
post-Apprendi nation. Put another way, Defendant Due Process
rights would be violated today, if the jury did not found him
guilty on a special verdict form for a threshold amount of drugs
under 21 U.S.C. § 841(a)(1), (b)(1)(A) & (B). Defendant was
charged in Count 36 for violating §  (b)(1)(B) without the jury
determination.

Furthermore, in a most recent case, Alleyne v. United States,
133 S. Ct. 2151 (2013), which the Supreme Court of the United States
held, any fact that increases the range of reasonable sentences
must be found by a jury beyond a reasonable doubt. In the case
at bar, Defendant was sentenced 19 years prior to said ruling.

4

Therefore, it can be determined that had Defendant been sentenced today, the jurors would have had to make the determination of the amount of drugs attributed to Defendant. Here, the fact that increased Defendant's sentence was based solely on relevant conduct not found by a jury beyond a reasonable doubt.

Ironically, the cases of **Apprendi, Booker, and Alleyne** were not retroactive to defendants sentenced prior to the rulings. Wherefore, Defendant was unable to benefit from. Defendant has been unable to benefit from many amendments that have been amended to the United States Sentencing Guidelines as well i.e., the **fast-track program** which was not in effect prior to Defendant's criminal trial proceedings. Had the fast-track program been implemented during Defendant's trial proceeding he would have pleaded guilty and been able to receive a **four point reduction** in his guideline range, resulting in an offense base level ("obl") of **39** resulting in a sentencing range of **324 to 405**. However, the government retains the power to make said determination of a four-point reduction. Again, said argument was propound herein, to litigate the many changes of the federal system which has evolved since Defendant's criminal trial proceedings.

Finally, when seeking relief in the federal courts once must litigate the Sentencing Factors of 18 U.S.C. § 3553(a) which reads in pertinent parts: **(a) Factors to be considered in imposing a**

sentence. The court shall imposed a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

   (1)   the nature and circumstances of the offense and the
   history and characteristics of the defendant;

   (2)   the need for the sentence imposed--

      (A)   to reflect the seriousness of the offense, to promote
      respect for the law, and to provide just punishment for
      the offense;

      (B)   to afford adequate deterrence to criminal conduct;

      (C)   to protect the public from further crimes of the
      defendant; and

      (D)   to provide the defendant with needed educational or
      vocational training, medical care, or other correctional
      treatment in the most effective manner

   In relation to the above sentencing factors in subsection (2)(A) of Section 3553, Defendant states in regards to (A) he has served over two decades in the Bureau of Prisons with only two infractions occurring 10 years apart. Two decades and counting is a just punishment for Defendant, and definitely shows respect for the law and the offense. Under (B) to afford adequate deterrence to criminal conduct. Defendant rehabilitative efforts have continuously displayed exemplary conduct. That is, staff members have attested to Defendant's post

rehabilitative efforts.  See (App. 1A thru 1C attached hereto).

Here, it can be determined that Defendant has maintained a positive

attitude throughout his incarceration, especially when the

General Foreman of Unicor, Factory Manager of Unicor, and the

Acting General Forman has submitted and attest to Defendant's

exemplary conduct.  Interestingly, said staff members mentions

the fact, that Defendant works well with other Unicor staff and

mentors other inmates.  It's clear that Defendant is spending his

time being productive and displaying exemplary conduct.  In light of

(C) the defendant is not a threat to society and when looking into

Defendant's background, this Court can make the conclusion that his

record is not that of a career offender.  That is, his record

prior to the instant offense does not reflect the crimes that

would deem one a threat to society.  Pertaining to (D) the Defendant

has completed a host of educational programs offered in the Bureau

of Prisons, and have trained many staff members and inmates in

Unicor ("Prison Industries").  Defendant does not suffer from

any medical conditions.  Therefore, when considering the sentencing

factors, it can be determined that Defendant is not a threat to

society and should be giving a second chance in society.  Especially,

when considering the Appendix attached hereto written by respectful

staff members that work side by side with Defendant on a daily basis,

as well when considering his prison disciplinary record.  Here, it

should be noted, there's no infractions for drugs or violence that

is often associated with prisoners incarcerated.  There's no infraction

for a weapon, nor any infraction that demonstrate Defendant being

problematic if the life sentence was removed from his sentence.

Furthermore, what benefit does it benefit defendants to rehabilitate themselves if our judicial and judiciary system does not believe in giving our citizens a second chance. Our jurispurdence is founded on the foundation of the Constitution of the United States of America, the land of opportunity. That opportunity is based on the principles dictated by the Constitution. To say one does not deserve a second chance only demise our just system. A system with bedrock principles and realistic meaning that executes integrity for all human-kind, including non-citizens of the United States such as Defendant in the matter at hand. A system that fundamental concepts and logic was based on the premises of the farmers of the U.S. Constitution, a constitution that renders equality to **ALL** and for **All**.

Enclosing, it should be duly noted, all of Defendant's co-conspirators now have a tentative release date, due to the changes that have ensued since the commencement of their incarceration. The only one that is still facing **LIFE** is Defendant. Therefore, the only inquisition remaining is the impervious questions of how long and how much rehabilitation, and support does it take to demonstrate rehabilitation and change.

Here, Defendant **has not** requested immediate release, but is requesting at the **mercy of this Court** a tentative release date. A date that does not read as Defendant's current computation sheet which only states **DECEASED** in big bold letters.

8

## CONCLUSION AND PRAYER

The defendant Jesus Olivares, prays that this honorable Court in good faith and in its discretion grant Defendant's Motion along with his Memorandum of Law in Support pursuant to **18 U.S.C. § 3582 (c)(2)**, to reduce or modify his sentence in accordance to Amendment **782** or any other relief it deems necessary.

Respectfully submitted,

Jesus Olivares, Pro se
Reg. No. 20583-077
Federal Correctional Institution
P.O. Box 1500
El Reno, Oklahoma 73036

## CERTIFICATE OF SERVICE

I, Jesus Olivares, hereby certify that on the 14th day of November, 2016, the foregoing instrument was forwarded to the Court Clerk located at **501 W. 10th St., RM 310, Fort Worth, TX 76102- 3643, via** first class, U.S., prepaid postage.

9

## DECLARATION OF PERJURY

I, Jesus Olivares, hereby declare under the laws of perjury the foregoing is true and correct.  28 U.S.C. § 1746.

Respectfully submitted,

/s/Jesus Olivares
Jesus Olivares

U.S. Department of Justice

Federal Bureau of Prisons

Unicor, El Reno Oklahoma, 73036 Phone (405) 262-4875

12/07/2012

MEMORANDUM FOR  Unit A Team

FROM: Charlie Holbrook, Factory Manager

SUBJECT:  Work and Program Accomplishments, Olivares, Jesus 20583-077

Jesus Olivares, 20583-077 has worked as the lead clerk in the Unicor factory planning office since November of 2002.  He has worked directly under my supervision for the past 10 years.  I have never employed an inmate with the kind of "can do", positive attitude that inmate Olivares displays on a daily basis.  He currently plans all of the production for the Unicor factory that produces over twelve million dollars of product annually.  Inmate Olivares is an expert in the use of the material requirements planning software (SAP) which is the same software used by numerous Fortune 500 companies. He accomplished this through in house training and hard work.  His skills would no doubt be a valuable asset to any private sector company.

Inmate Olivares helps the production controller review all raw material requirements and prepare requests for purchase, statements of work and requests for contract action.  He assists the engineering department with costing of products and customer quotations.

He has discovered numerous opportunities for the factory to save money by using unallocated materials or discovering mistakes made during the procurement process or engineering process.  A conservative estimate of cost savings for the Unicor factory directly related to inmate Olivares' efforts would be over one million dollars during the past ten years.

Inmate Olivares works well with all Unicor staff and has earned the respect of everyone in the factory.  He is the "go to" guy when there is a problem with production or SAP. He mentors other inmates and expects others to care about the Unicor factory as much as he does.

Unicor was established to provide incarcerated individuals with the opportunity to learn a trade or skill that would help them become productive members of society once released to the community.  Inmate Jesus Olivares, 20583-077 has taken advantage of the Unicor program and is by far the best example of an inmate rehabilitating himself that I have seen during my 22 years working in Unicor.  I can say without hesitation that he is an individual that would be successful given the opportunity for release from incarceration. I would not hesitate to recommend him for employment to any individual or company requesting a reference.

App. 1B



U.S. Department of Justice
Federal Bureau of Prisons

Unicor, El Reno Oklahoma, 73036 Phone (405) 262-4875

May 10, 2011

MEMORANDUM for A Unit Team

FROM: Rex Bohn, General Foreman, Unicor

SUBJECT: Work & Program accomplishments of inmate Olivares, Jesus 20583-077

Inmate Olivares has worked for Unicor El Reno since August of 1996. He began as a hanger at MDT 17 and went to planning office (MDT 19) in November of 2002. He has been the material management and job production specialist since February of 2003. He has been very receptive to learning new things and has done an outstanding job in the planning office. He is very proficient with *SAP*. *SAP* is the IT system used by all Unicor locations throughout the Bureau of Prisons to track raw materials, component parts and end item products, in a material master code as well as customer order entries. Olivares is able to look ahead and see what work is coming up in the near future as well as 120 days out by utilizing the *ZBACK* report and using his own design of spread sheets to track materials and the release and movement of component parts to build end item products at El Reno Unicor. These spread sheets are updated sometimes hourly and readily available information which allows me to carry these sheets around with me as I walk throughout the shops everyday. Olivares likes the challenge of doing difficult tasks and is very organized with keeping track of materials and jobs. Olivares is able to look at Unicor prints, plan work according to material availability, and then release jobs to the floor for various work centers to cut materials in order of making material drop very minimal. This alone saves El Reno Unicor $10,000 to $50,000 in a quarter on materials, depending on the project. He is very polite, courteous, and respectful to staff. His combination of a very positive attitude, exceptional intelligence, being self motivated, and ability to get along well with inmates of all ethnic groups throughout the factory, makes him the most useful and necessary tool El Reno Unicor has.

On the institution side of the compound Olivares is active in numerous programs available. He is enrolled in a purchasing agent apprenticeship program which he began in January of 2009. After work he spends time in the Recreation Department's Leisure Center in the Mirror Etching programs available since the beginning of the program in 2006. He has coached and or played in one of the A-League Softball teams from 2000 to the present season.

CC: Unicor File
      Unit A team

App. 1C



U.S. Department of Justice
Federal Bureau of Prisons

UNICOR, El Reno Oklahoma, 73036 Phone (405) 319-7415

October 19, 2011

MEMORANDUM FOR: Unit A Team

FROM: Tom Glenn, Acting General Foreman, UNICOR

SUBJECT: Work & Program accomplishments of inmate
Olivares, Jesus 20583-077

    Inmate Olivares has worked for UNICOR El Reno since August of 1996. He began as hanger in for me in MDT-17. He became an integral part of the daily production of the Powder Paint Shop. Thru his organizational skills he quickly became a driving force to a much diversified Production Schedule. Thru the years with his even temperament in dealing with the varied ethnic groups and his dedicated work ethic, he caught the eye of upper Management in November of 2002 he went to (MDT-19) Planning Office. Since February of 2003 he has been the Material Management and Job Production Specialist.

(Refer to Rex Bohn memo)

In the past 18 months of UNICOR Production the factory worked double shifts. Of those 18 months of Production, Olivares was able to maintain the production standards as if it were a normal daily production schedule. In the past 18 months UNICOR was able to produce over 30 million of products from this factory, with several 3 million dollar months and a 4 million dollar month of production. Olivares maintained composure and a steady demeanor through this production schedule facilitating staff throughout the factory in job moves and issuing materials.

CC: UNICOR FILE
    Unit A Team

```
 EREBO           *      INMATE EDUCATION DATA        *     06-27-2016
 PAGE 001 OF 001 *          TRANSCRIPT               *     15:18:46

 REGISTER NO: 20583-077    NAME..: OLIVARES              FUNC: PRT
 FORMAT.....: TRANSCRIPT   RSP OF: ERE-EL RENO FCI

 ------------------------ EDUCATION INFORMATION ------------------------
 FACL ASSIGNMENT DESCRIPTION            START DATE/TIME  STOP DATE/TIME
 ERE  ESL HAS    ENGLISH PROFICIENT     09-13-1994 0749  CURRENT
 ERE  GED HAS    COMPLETED GED OR HS DIPLOMA 08-26-1994 0811  CURRENT


 ----------------------- EDUCATION COURSES -----------------------
 SUB-FACL   DESCRIPTION              START DATE  STOP DATE EVNT AC LV  HRS
 ERE        VT BUS EDUC/IVY/9-10AM   04-02-2013 04-25-2014  P  C  C   300
 ERE        PURCHACING AGENT         10-30-2008 04-02-2013  P  P  A  3467
 ERE        PLASTIC MODELING CLASS   07-09-2012 08-31-2012  P  C  P     6
 ERE        INTRODUCTION TO PORTUGUESE ACE 12-29-2011 12-29-2011  P  C  P    20
 ERE        R1 WELLNESS 2            07-27-2009 09-16-2009  P  C  P    64
 ERE        BLOOD PRESSURE CHLORLESTEROL 08-20-2008 12-10-2008  P  C  P    72
 ERE        PRNT:MONEY SKILLS FOR FAMILIES 05-06-2008 07-01-2008  P  C  P    15
 ERE        HOW TO START A CORPORATION ACE 05-05-2008 06-19-2008  P  C  P    20
 ERE        AFRICA NATIONAL GEOGRAPHIC VID 05-10-2008 05-10-2008  P  C  P     8
 ERE        PRNT:INSIDE/OUTSIDE DAD  04-14-2008 04-30-2008  P  C  P    10
 ERE        ANIMALS IN THE WOMB      04-22-2008 05-03-2008  P  C  P     2
 ERE        GLOBAL WARMING VIDEO SERIES 03-28-2008 04-12-2008  P  C  P     2
 ERE        CHINA REVEALED VIDEO SERIES 03-28-2008 04-09-2008  P  C  P     2
 ERE        BEG MIRROR ETCHING-530-800 01-04-2007 02-23-2007  P  C  P    80
 ERE        R1-WELLNESS 2            01-09-2006 02-24-2006  P  C  P    64
 ERE        RPP: DAP INDEPEND STUDY  08-10-2005 10-21-2005  P  C  P    12
 ERE        AEROBICS (MW, 9-10)      07-08-2002 11-22-2002  P  C  P    32
 ERE        OFFICIALS CLINIC         03-26-2002 03-26-2002  P  C  P     2
 ERE        BEG LEATHER CRAFT-1230-300 10-05-1998 11-30-1998  P  C  P    80


 ----------------------- HIGH TEST SCORES -----------------------
 TEST       SUBTEST        SCORE    TEST DATE    TEST FACL  FORM    STATE
 CASAS      LIST PLACE     225.0    05-18-2011   ERE        1
            READ PLACE     225.0    05-18-2011   ERE        1




 G0000      TRANSACTION SUCCESSFULLY COMPLETED
```